***********
The undersigned reviewed the prior Opinion and Award, based upon the record of the proceedings before Deputy Commissioner Chapman. The appealing party has not shown good ground to reconsider the evidence; receive further evidence; rehear the parties or their representatives; and having reviewed the competent evidence of record, the Full Commission affirms the Opinion and Award of Deputy Commissioner Chapman with minor modifications.
 ***********
The Full Commission finds as fact and concludes as matters of law the following, which were entered into by the parties at the hearing before the Deputy Commissioner as:
 STIPULATIONS
1. All parties are properly before the North Carolina Industrial Commission, and are subject to and bound by the provisions of the North Carolina Workers' Compensation Act. All parties have been correctly designated, and there is no issue of misjoinder or nonjoinder of parties. *Page 2 
2. On the date of the injury by accident, January 4, 2000, an employment relationship existed between plaintiff-employee and defendant-employer.
3. At all times pertinent hereto, Liberty Mutual Insurance Company insured the employer's workers' compensation risk.
4. Plaintiff was a full-time employee of the employer on January 4, 2000.
5. On January 4, 2000, plaintiff-employee fell on the employer's premises, fracturing her left elbow, and injuring her left shoulder.
6. Defendants paid plaintiff compensation pursuant to an I.C. Form 60 dated June 2, 2000, beginning that date, in respect to the period April 21, 2000 through March 1, 2001, at the rate of $320.20 per week.
7. Plaintiff received payments of $232.43 per week from the defendant-carrier from March 8, 2001 through October 30, 2003.
8. Defendants admitted liability for the period of plaintiff's inability to earn wages due to the surgery on July 16, 2004, on an I.C. Form 62 dated July 27, 2004, at the rate of $232.43 per week. Over the subsequent two weeks, the carrier made four such payments, although plaintiff was unable to work only two weeks. Consequently, defendants are entitled to a credit of $464.86 against liability due.
In addition, the parties stipulated into evidence the following:
1. Packet of exhibits, which included Industrial Commission forms and filings, medical records and reports, payment histories, earnings records, correspondence and the contents of plaintiff's personnel file.
 2. Packet of additional earnings records. *Page 3 
The Pre-Trial Agreement dated November 30, 2004, which was submitted by the parties, is incorporated by reference.
 *********** EVIDENTIARY RULING
Plaintiff's motion to add additional evidence in the form of plaintiff's IRS Form W-2 for 2004 from Lampe Management Co. is hereby DENIED.
 ***********
Based upon all of the competent evidence of record and reasonable inferences flowing therefrom, the Full Commission makes the following:
 FINDINGS OF FACT
1. Plaintiff, who was fifty-nine years old at the time of the hearing before the deputy commissioner, began working for defendant department store on September 7, 1999 as a cosmetologist. Although she initially worked full-time hours, shortly after she was hired, she got a second job with Southern Property Management. At that time, she began working part-time hours for defendant-employer. Her agreement with Southern Property Management was that she would be available every weekend to work for the department store, and she was able to average working almost twenty hours per week for defendant-employer under that arrangement.
2. Plaintiff's job with defendant-employer involved serving customers at the Estee Lauder display, selling them products and doing makeovers, as well as placing products on the shelves and periodically changing the displays. When doing a makeover, she would apply makeup onto the customer's face.
3. Southern Property Management subsequently advised plaintiff that she would have to start working on Saturdays. Since that would conflict with her job with defendant-employer, *Page 4 
she quit her job there and began working full time for defendant-employer. Payroll records indicated that she worked full time from November 21, 1999 through January 1, 2000, working an average of 40.5 hours per week and making an average of $511.03 per week.
4. On January 4, 2000 plaintiff sustained a compensable injury by accident arising out of and in the course of her employment when she tripped and fell in the store. She landed hard on her left side, injuring her left shoulder and elbow and, to a lesser extent, her left hip. She also sustained a contusion at her left eyebrow. An ambulance was summoned and she was taken to the hospital where x-rays revealed a fracture of the olecranon bone at her elbow. The emergency room physician splinted her elbow, placed her in a splint and advised her to see an orthopedic surgeon.
5. Dr. Burroughs then examined plaintiff on January 7, 2000. The elbow fracture was not a surgical issue, so he treated her conservatively. She was initially so tender that he could not determine whether the extensor mechanism of her elbow was intact, but he was able to test it with good results at her next appointment on January 17, 2000. Plaintiff's elbow symptoms improved but her left shoulder became increasingly stiff and painful. Dr. Burroughs injected her shoulder on February 8, but plaintiff did not obtain much relief. He subsequently ordered an ultrasound and an MRI. No rotator cuff tear was demonstrated by the tests. The doctor also referred her to a neurosurgeon, who ordered a cervical MRI to see if her arm symptoms could be the result of a problem in her neck, but there was also no clear discogenic process shown, just some degenerative disc disease.
6. Dr. Burroughs continued to treat the elbow injury as well as the shoulder, and by March 2000 he had diagnosed subluxation of the ulnar nerve, or cubital tunnel syndrome. He *Page 5 
discussed surgical treatment for that condition. However, since plaintiff had no symptoms of neuropathy at the time, there was no hurry to schedule the procedure.
7. Plaintiff's shoulder continued to be her primary problem. By late April 2000 it was causing debilitating pain with considerable loss of motion. The diagnostic tests had not revealed a surgical problem, so Dr. Burroughs referred her to a pain clinic, where she was treated with various medications, an epidural steroid injection and physical therapy. She was also referred for counseling due to symptoms of depression arising from her chronic pain. By June 29, 2000, plaintiff was indicating that the doctor could cut off her arm, so at that point he referred her to the Duke Orthopedic Clinic.
8. Dr. Speer, an orthopedic surgeon, then examined plaintiff on August 9, 2000. Although the pain in her elbow was mild at that time, he found her ulnar nerve to be too mobile. Nevertheless, he did not recommend surgery for the condition at that appointment. He diagnosed her shoulder condition as post-traumatic frozen shoulder and prescribed a three-week course of Prednisone along with two months of physical therapy.
9. By her next appointment with Dr. Speer on September 29, 2000, plaintiff had noticeably improved. The doctor ordered two more months of physical therapy and released her to return to light-duty effective October 7, 2000. Her shoulder continued to improve and on January 18, 2001, Dr. Speer indicated that she had reached maximum medical improvement insofar as her shoulder condition was concerned. He released her from his care at that time.
10. By the time Dr. Speer released plaintiff, she was employed by Alliance Residential as an apartment manager. She never returned to work for defendant-employer after that date. However, she left Alliance Residential in May 2001 and subsequently went to work Lampe Management as the manager of a storage unit facility. *Page 6 
11. Plaintiff did not see Dr. Speer again until July 23, 2002 when she returned complaining primarily of her left elbow. At that time, she was experiencing symptoms of ulnar neuropathy associated with her cubital tunnel syndrome. The condition was a proximate result of her injury at work. Since she was at risk of developing neuropathic pain, a problem which would be difficult to treat, should her ulnar nerve problem not be corrected, Dr. Speer recommended that surgery be performed to her elbow expeditiously. Defendants, however, would not authorize the procedure. Finally, on June 17, 2004 plaintiff returned to doctor with approval for surgery.
12. On July 16, 2004 Dr. Speer operated on plaintiff's left arm to transpose the ulnar nerve in her elbow and to also manipulate her shoulder joint while she was under anesthesia in order to break up the adhesions and scar tissue which were continuing to restrict the motion of the joint. Plaintiff did very well after the surgery and was able to regain the motion of her shoulder. She also had an excellent result from the elbow procedure. Consequently, on October 25, 2004 Dr. Speer released her from care with no permanent restrictions and with a fifteen percent permanent partial impairment rating to the arm.
13. Defendants have admitted liability for benefits under the Workers' Compensation Act for plaintiff's January 4, 2000 injury by accident pursuant to a Form 60 and have paid compensation to her for temporary total disability as stipulated by the parties.
14. The first issue raised in this case related to the average weekly wage which should be used to compute the compensation due to plaintiff. She did not work for Dillards for fifty-two weeks prior to her injury, so the primary method under the statute could not be used. Although she worked seventeen weeks for the store prior to her injury, approximately two months of that period was part-time work while she held a second job with a different company. Since she had *Page 7 
been working full time for over six weeks before her injury, it would not be fair to her to include the period of part-time earnings in computing her average weekly wage. Although defendants could reasonably argue that it not be fair to them to use her earnings during the holiday period, they did not provide a wage chart for a comparable employee. Furthermore, they did not introduce evidence that the cosmetologists in the store had more work during the holiday period than during the rest of the year.
15. But for the injury at work, plaintiff would have been earning approximately $511.00 per week in her employment with defendant-employer, and that amount is found to have been her average weekly wage as of January 4, 2000.
16. As a result of her injury on January 4, 2000, plaintiff was unable to work for nine days in January 2000, and for two days in February 2000. In March 2000 she began working part-time because she took another job with MetroCall. However, she left that job and returned to her full time schedule with defendant-employer by March 26, 2000. With the wages from both jobs, she did not lose wages that month. Her condition worsened by late April and she began missing work on April 21, 2000. Defendants ultimately paid her compensation beginning on that date.
17. Although plaintiff returned to work on October 10, 2000, defendants continued paying her compensation at her full compensation rate. She was still receiving physical therapy and could not safely do makeovers of customers. Consequently, her earnings were reduced. She earned an average of $463.53 per week from October 10 through November 11, 2000 when she quit. These earnings were $47.50 less than her former average weekly wage. Dr. Speer confirmed that plaintiff's shoulder and elbow symptoms would have limited her with respect to applying makeup onto customers' faces. Consequently, she was not able to perform all of her *Page 8 
regular job duties with defendant-employer due to her injury. She quit because her supervisor was pressuring her to do makeovers despite her limitations and her concern about injuring a customer.
18. Plaintiff was only out of work from November 12 until November 22, 2000 when she began working for Alliance Residential. During the rest of the year, her average weekly wage with the new company was $383.36, a reduction of $127.67 from her former average weekly wage with defendant-employer. In 2001, however, her earnings increased to $578.52 per week, which exceeded her former average weekly wage. Due to problems there, plaintiff stopped working for Alliance Residential after May 19, 2001 and subsequently began working for Lampe Management Company in August 2001.
19. Plaintiff's earnings for Lampe Management Company in 2001 were shown to be $6,954.43. Assuming that she worked there for twenty weeks that year, her average weekly wage was $347.52, which was $163.51 less than her former average weekly wage with defendant-employer. She earned $379.51 per week on average in 2002, a reduction of $131.52, and she earned $429.24 per week in 2003, which was $81.79 less than her former average wage. No evidence was offered to establish her earnings in 2004. Consequently, she did not prove loss of wage earnings capacity after December 31, 2003 except that she was completely disabled for two weeks beginning the date of her operation on July 16, 2004.
20. Since plaintiff required surgery for her left elbow and since defendants would not authorize the operation for years after it was recommended, she did not reach maximum medical improvement with respect to all of the injuries she sustained due to her accident at work until October 25, 2004. Plaintiff sustained a fifteen percent permanent partial disability to her left arm as a result of the injury by accident giving rise to this claim. *Page 9 
21. This claim was defended with reasonable grounds.
 ***********
Based upon the foregoing stipulations and findings of fact, the Full Commission reaches the following:
 CONCLUSIONS OF LAW
1. Plaintiff's average weekly wage with defendant-employer was $511.03, in that she had not worked fifty-two weeks prior to her injury, in that her period of employment included a period of part-time work whereas she was working full time prior to her injury so there was an exceptional reason for not using her earnings during her entire period of employment, and in that defendants did not offer an alternative means of computing an average weekly wage, such as a wage chart from a comparable employee, which might have provided a more fair way to determine the wage. N.C. Gen. Stat. § 97-2(5); Hendricks v Hill RealtyGroup, Inc., 131 N.C. App. 859 (1998).
2. Plaintiff was entitled to compensation for temporary total disability at the rate of $340.69 per week for a total of forty-one and 6/7ths weeks as a result of the injury by accident giving rise to this claim. Although defendants paid compensation to her at an incorrect rate, since they paid compensation for too many weeks, the total compensation paid exceeded the amount due and defendants are entitled to a credit for the compensation paid. N.C. Gen. Stat. §§ 97-29;97-42.
3. Plaintiff was entitled to compensation for temporary partial disability at the rate of $31.67 per week for four and 5/7ths weeks for the period from October 10 through November 11, 2000, at the rate of $85.12 per week for five and 5/7ths weeks for the period from November 22 through December 31, 2000, at the rate of $109.00 per week for twenty weeks for the period *Page 10 
from August 14 through December 31, 2001. At the rate of $87.67 per week for fifty-two and 1/7ths weeks for 2002 and at the rate of $54.53 per week for fifty-two and 1/7ths for 2003. Defendants previously paid compensation to her in excess of this amount and they are entitled to a credit for the compensation paid. N.C. Gen. Stat. §§ 97-30; 97-42.
4. Plaintiff is entitled to compensation at the rate of $340.69 per week for thirty-six weeks for the fifteen percent permanent partial disability she sustained to her left arm as a result of this injury by accident, subject to a credit in favor of defendants for compensation previously overpaid for temporary total and temporary partial disability. N.C. Gen. Stat. §§ 97-31 (13) and (19); 97-42.
5. Plaintiff is entitled to have defendants provide all medical compensation arising from this injury by accident. N.C. Gen. Stat. §§97-2(19); 97-25.
6. Plaintiff is not entitled to have attorney's fees assessed against defendants in that defendants defended this claim with good grounds. N.C. Gen. Stat. § 97-88.1.
 ***********
Based upon the foregoing findings of fact and conclusions of law, the undersigned enters the following:
 AWARD
1. Defendants are entitled to a credit for compensation previously paid to plaintiff for total disability which amount exceeds the compensation due for temporary total disability: forty-one and 6/7ths weeks at the rate of $340.69 per week.
2. Defendants are entitled to a credit for compensation previously paid for total disability as against the compensation otherwise due to plaintiff for temporary partial disability: $31.67 per week for four and 5/7ths weeks, $85.12 per week for five and 5/7ths weeks, $109.00 *Page 11 
per week for twenty weeks, $87.68 for fifty-two and 1/7ths weeks and $54.53 per week for fifty-two and 1/7ths weeks. The compensation paid exceeds the compensation due.
3. Defendants are also entitled to a credit for compensation previously paid to plaintiff for total disability as against the compensation otherwise due for permanent partial disability, which would be $349.59 per week for thirty-six weeks. It appears that the compensation previously paid exceeds the compensation due for permanent partial disability.
4. Defendants are entitled to a credit for any additional compensation overpaid to plaintiff as against future compensation which may become due.
5. Defendants shall pay all medical expenses incurred by plaintiff as a result of this injury by accident.
6. Each side shall pay its own costs.
This the 20th day of March, 2006.
S/___________________ BUCK LATTIMORE CHAIRMAN
CONCURRING:
 S/_____________ DIANNE C. SELLERS COMMISSIONER
DISSENTING WITHOUT WRITTEN OPINION
 S/_____________ THOMAS J. BOLCH COMMISSIONER *Page 1